## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---------------------------------------------

| | | |
|---|---|---|
| JEANNE BRUNO | : | CIVIL ACTION |
| Plaintiff, | : | NO. 3:01CV1501 (MRK) |
| v. | : | |
| | : | |
| | : | |
| SONALYSTS, INC. | : | |
| Defendant | : | DECEMBER 11, 2003 |

---------------------------------------------

### SUPPLEMENTAL BRIEF ON RULE 408 ISSUES

## I.    INTRODUCTION/BACKGROUND

This is an action brought under Title VII and the Connecticut Fair Employment Practices Act (CFEPA) and the Family and Medical Leave Act (FMLA).  The plaintiff, Jeanne Bruno, was terminated by defendant Sonalysts, on or about September 1, 2000.  She was terminated while on a leave of absence that arose out of her complaint of retaliation for complaining of sexual harassment and after she had requested Family and Medical Leave.  Ms. Bruno claims, *inter alia*, that her termination was in retaliation for seeking Family and Medical leave or in retaliation for her having complained of sexual harassment and/or of retaliation for having so complained.

Defendant Sonalysts, filed a Motion for Summary Judgment on or about July 11, 2003. Plaintiff filed her objection thereto on or about August 29, 2003.  The Court, Kravitz, J., heard oral argument on the Motion for Summary Judgment on November 21, 2003.  As to Ms. Bruno's claims that her termination was in retaliation for either requesting FMLA or for having previously complained or sexual harassment/retaliation, Sonalysts asserts as its sole "legitimate non-discriminatory reason for termination" that it believed Ms. Bruno had no intention of returning to her job.  The primary evidence supporting this belief is a purported statement by

Bruno's lawyer, to Sonalysts' lawyer, during a conversation in which the lawyers were seeking to negotiate a resolution of Ms. Bruno's legal claims against Sonalysts. The statement in question is asserted to have been to the effect that Ms. Bruno did not intend to return to work at Sonalysts. Due to Sonalysts' reliance on the alleged statement of plaintiff's counsel during settlement negotiations to rebut plaintiff's prima facie case of retaliation, it became apparent at oral argument that the Court could not rule on the Motion for Summary Judgment without deciding, as a preliminary matter, whether evidence as to what plaintiff's lawyer allegedly said during settlement negotiations would be allowed into evidence at trial.

In light of the need to resolve this evidentiary issue prior to ruling on the Motion for Summary Judgment, the Court ordered both parties to simultaneously submit briefs addressed to three general issues:

(1)    Does Rule 408 of the Federal Rules of Evidence allow admission into evidence of a statement made by plaintiff's counsel in settlement negotiations if it is offered to prove the "state of mind" of the defendant?

(2)    Is defendant's claim that it terminated plaintiff because it believed, based at least in part on the alleged statements of plaintiff's counsel during settlement negotiations, that plaintiff did not intend to return to work sufficient to rebut plaintiff's prima facie case of retaliation under Title VII, CFEPA and the FMLA?

(3)    If the Court determines that defendant will be allowed to offer evidence as to what plaintiff's lawyer allegedly said during settlement negotiations, what further proceedings are necessary prior to resolution of this Motion for Summary Judgment and/or trial?

This initial brief was to be submitted on December 12, 2003. The Court further allowed a ten (10) day period of time in which both parties could submit reply briefs responding to points raised in the opposing party's initial brief. This is plaintiff's initial brief addressed to the three questions framed by Judge Kravitz on November 20, 2003.

2

## II.    LEGAL ARGUMENT

(A)    **Rule 408 of the Federal Rules of Evidence does not allow admission into evidence of a statement made by plaintiff's counsel in settlement negotiations to prove the "state of mind" of the defendant when admission of such evidence would frustrate the policy behind the Rule.**

1.    The Standard for Admission of Statements from Settlement Negotiations

Rule 408 of the Federal Rules of Evidence reads as follows:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, sch as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis supplied.) Rule 408 evolved out of a common law exclusion from evidence of statements made in settlement discussions as long as the lawyer making such statements contrived to present any factual assertions "hypothetically" or "conditionally." See generally, Mueller & Kirkpatrick, 2 Federal Evidence, § 134 (2d Ed.); McCormick on Evidence § 266 (4th Ed.) The Rule's more absolute protection of statements made in settlement negotiations, without need for such "prophylactic language" prevented settlement negotiations from being exploited to advance litigation. Brazil, Protecting the Confidentiality of Settlement Negotiations, 39 Hastings L. J. 955, 958-59 (1988). Thus, Rule 408 was specifically intended to encourage and facilitate candid settlement discussions, which served to increase the likelihood of non-judicial resolution of all kinds of cases. Id.

The public policy reflected in Rule 408 has been stated by other Districts Courts within the Second Circuit as follows:

> The rule is not designed to lock away settlement documents, forever shielding them from view by those not party to the agreement. While it is true that the rule seeks to encourage the settlement process, it accomplishes that purpose not by making the settlement information unavailable, but by limiting abusive use of positions taken during the process. The rule insures that offers of compromise will not have intrinsic evidentiary value. The rule recognizes that in the give and take of settlement negotiations offers and concessions are made which are inconsistent with the legal and factual positions maintained by the parties. The rule recognizes that parties will be discouraged from making settlement offers if those offers may be used as evidence at trial. The rule thus fosters non-judicial resolution of disputes because compromises made during the settlement process will not later surface to haunt the parties as substantive evidence.

(Emphasis supplied.) <u>Alcan International Limited v. The S.A.Day Manufacturing Co., Inc.</u>, 179 F.R.D. 403, 404 (W.D.N.Y. 1998) citing <u>Bank Brussels Lambert v. Chase Manhattan Bank, N.A.</u>, 1996 WL 71507 at *2 (S.D.N.Y. Feb. 20, 1996).

Although Rule 408 is not normally construed as an absolute bar against the admission of statements made by counsel during settlement negotiations, the policy behind the rule is so important that "in practice settlement evidence is more often than not excluded altogether." Mueller and Kirkpatrick, <u>Federal Evidence</u> § 134 (2d Ed.). There are two theoretical approaches which justify the general trend of exclusion. One is to construe Rule 408 itself as prohibiting the introduction of statements made in settlement negotiations when admission would undermine the policy behind the Rule. See, e.g., <u>S&S Tobacco & Candy Co., Inc. v. Stop & Shop Companies, Inc.</u>, 107 F.3d 4, 1997 WL 35327 *3 (2d Cir. 1997) (unpublished opinion) citing <u>Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.</u>, 865 F.2d 506, 510-11 (2d Cir. 1989). The second approach supporting the general trend of exclusion is to find such evidence admissible under Rule 408 but to then exclude it under Rule 403 if its probative value is substantially

4

outweighed by the the danger of unfair prejudice, confusion of the issues, or misleading the jury. See, e.g., Williams v. Chevron U.S.A., Inc., 875 F.2d 501,504 (5th Cir. 1989). Interestingly enough, even those cases that purport to use the first approach to exclusion often utilize the language of the Rule 403 balancing test, without citing to Rule 403. See, e.g., EEOC v. Gear Petroleum, Inc., 948 F.2d 1542, 1545-46 (10th Cir. 1991). The most important aspect of the Courts' analyses in all cases seems to be the recognition of the overarching public policy served by a general rule of exclusion unless admission will clearly not frustrate the laudable goal of fostering meaningful settlement negotiations and protecting parties who do so from being ambushed in court due to their willingness to engage negotiations in good faith and with full candor. See, e.g., EEOC v. Gear Petroleum, Inc., 948 F.2d 1542, 1545-46 (10th Cir. 1991) citing Saltzburg and Redden, Federal Rules of Evidence Manual, 286 (4th ed. 1986) ("The philosophy of the Rule is to allow the parties to drop their guard and to talk freely and loosely without fear that a concession made to advance negotiations will be used at trial.")

     2.    The Competing Interests

In light of the above cited authority, the Court here must determine whether the specific evidence offered by Sonalysts is more properly admitted in light of the express purpose of Rule 408 and the risks of unfair prejudice to the plaintiff, confusion of the issues or misleading the jury. To embark on its analysis, the Court will ask what the evidence is, for what purpose the evidence is offered, what risk of prejudice exists, and whether that risk of prejudice outweighs the probative value of the claimed purpose.

The evidence in question is that Sonalysts was told by its lawyer (Alice DeTora) that plaintiff's lawyer (Susan M. Phillips) had told her that plaintiff had no intention of returning to

5

employment with Sonalysts.  See, Termination Letter, attached as Exhibit A, Affidavit of Andrew N. Toriello dated November 15, 2000 (next to last page of affidavit), attached as Exhibit B, and Transcript of Andrew N. Toriello's deposition at p. 74, attached as Exhibit C.

Defense counsel represented at oral argument on November 21, 2003 that the evidence of what plaintiff's attorney said to defendant's attorney during settlement negotiations was to be offered for the limited purpose of establishing Mr. Toriello's state of mind when he wrote the letter terminating Ms. Bruno's employment.  Termination Letter attached as Exhibit A.  It is significant that there has been no claim by defendant that this evidence made in settlement negotiations is offered as to a prior inconsistent statement by plaintiff or admission of a party opponent.  Thus, for purposes of this brief, it will be assumed that defendant offers the evidence of statements by plaintiff's counsel in settlement negotiations for the sole purpose of proving Mr. Toriello's/Sonalysts' state of mind when it terminated Ms. Bruno's employment.

The fact that the evidence defendant wishes to offer is taken directly from settlement negotiations between counsel requires consideration of the policy reflected in Rule 408 and whether admission of such statements would frustrate that policy.  As set forth at the outset of this section of this brief, a significant policy behind Rule 408 is to encourage candid settlement talks between parties and/or their counsel without the specter of having attempts to settle used against the party at trial.

It is probably safe to say that most lawyers operate in their day to day lives believing that nothing they say when they discuss settlement with opposing counsel will be used against their clients in litigation.  As noted by the Tenth Circuit, "the general understanding among lawyers is that inconsistent conduct or statements made in connection with compromise negotiations may

6

*not* be admitted into evidence." (Emphasis in original.) EEOC v. Gear Petroleum, Inc., 948 F.2d 1542, 1545 (10th Cir. 1991).  The reason for this general understanding is both the language of the rule: "Evidence of conduct or statements made in settlement negotiations is likewise not admissible" and the fact that statements by lawyers are very seldom offered into evidence.  "One reason why statements by lawyers during settlement would not be offered is that the lawyer on the other side is the only likely witness, and the latter would probably not even consider testifying on such matters."  Mueller & Kirkpatrick, Federal Evidence § 138 (2d Ed.)  Given this general understanding, admission of a statement made by plaintiff's counsel in settlement negotiations would seriously and unfairly prejudice the plaintiff, who never expected such use of settlement discussions.  As will be discussed is Section II. C. of this brief, admission of evidence concerning what plaintiff's counsel was believed to have said will also result in plaintiff needing to obtain new counsel.  This is a heavy burden to impose on a party when they have engaged in the very conduct meant to be encouraged by Rule 408.

When considering the admission of statements made in settlement negotiations pursuant to Rule 408, the Second Circuit has expressly directed that consideration be given to the extent to which the evidence offered is addressed to an impermissible use as well as the claimed permissible use.  When statement made in settlement negotiations are offered for a permissible purpose, that is "closely intertwined" with proof of liability or invalidity of a claim, that evidence should not be admitted.  See, Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., 865 F2d 506, 510 (2d Cir. 1989).  (Because evidence offered to show satisfaction of statute of frauds was necessary to prove validity of claim for breach of contract, it was properly excluded under Rule 408.)  In this case, Sonalysts offers the settlement evidence as part of its proof that it had a

7

legitimate non-discriminatory reason for termination which it must do to establish the invalidity of plaintiff's claims that the termination was retaliatory. Thus, admission of a statement that plaintiff had no intention of returning to work goes directly to the heart of whether the plaintiff's claim is valid and cannot be neatly compartmentalized as evidence going exclusively to Sonalysts' state of mind. Given that the claimed permissible use of the settlement evidence is inextricably intertwined with the necessity of proving the invalidity of plaintiff's claim, it is properly excluded under Second Circuit case law applying Rule 408. Admission of the evidence for the purported proper purpose of proving state of mind cannot be obtained without also allowing it to speak to defendant's assertion that plaintiff's claims are invalid. Thus, it is exactly the kind of evidence intended to be excluded by Rule 408.

There are additional risks of prejudice present here based on the nature of the evidence offered. Any evidence of what plaintiff's counsel said to defendant's counsel during settlement negotiations could be considered hearsay if offered for the truth of the matter asserted. Defense counsel gets around this by offering the Mr. Toriello's statements to prove his own state of mind rather than the truth of the matter asserted. It must be kept in mind, however, that there is always a risk that, even with proper instruction, a jury will mistakenly rely upon the statements as proof that plaintiff did not intend to return to work at Sonalysts. This is a risk of not only unfair prejudice to plaintiff but also of confusion of the issues and misleading the jury.

      3.   <u>The evidence offered of statements by plaintiff's counsel during settlement negotiations must be excluded in order to effectuate the policy of Rule 408.</u>

To summarize, Rule 408 is generally understood by lawyers to prohibit the admission into evidence of conduct or statements made in settlement negotiations. Although there is an

exception to exclusion from evidence when statements from settlement negotiations are offered for some purpose other than to establish liability or to prove the invalidity of a claim, this exception is only properly applied if: (1) the permitted purpose is not intertwined with the forbidden purpose; and (2) the risk of unfair prejudice, confusion of the issues and misleading the jury do not outweigh the purpose for admission.  In the circumstances of this case, the claimed purpose for admission is inextricably intertwined with the prohibit purpose of defendant proving the invalidity of plaintiff's claim.  There is also a significant risk of unfair prejudice to the plaintiff, confusion of the issues and misleading the jury as to the significance of the evidence. The Court must rule that any evidence of what plaintiff's counsel said in settlement negotiations is inadmissible for purposes of either summary judgment or trial in order to effectuate the laudable policy behind Rule 408.

> Rule 408
>
> rests mainly upon extrinsic policy–here it is the policy of encouraging the out-of-court settlement of disputes.  So important is this policy, and so highly regarded the exclusionary rule, that in practice settlement evidence is more often than not excluded altogether.  There are, to be sure, purposes for which the proof is competent, but these are relatively narrow.  It is well recognized, and rightly so, that the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 require exclusion even when a permissible purpose can be discerned.

Mueller and Kirkpatrick, <u>Federal Evidence</u> § 134 (2d Ed.).

> By resolving close cases in favor of admitting the evidence, courts could strike fear into the hearts of negotiating lawyers and clients and could compel them to play their settlement cars closer to their chest.  Negotiations would thus become more of an irrational poker game and deprive parties of access to the reasoning that supports one another's positions. . . .  Every blow the courts strike against openness is a blow against the health of the system and against the fundamental values on which it is based.

Brazil, Protecting the Confidentiality of Settlement Negotiations, 39 Hastings L. J. 955, 959-60 (1988).

**(B)     Defendant's claim without need for evidentiary support that it terminated plaintiff because it believed that plaintiff did not intend to return to work is sufficient to rebut plaintiff's prima facie case of retaliation under Title VII, CFEPA and the FMLA, but requires a jury to decide the ultimate issue of whether this reason was pretext.**

The familiar <u>McDonnell Douglas</u> burden shifting analysis has been regularly applied by courts within the Second Circuit to evaluate cases involving retaliation for complaining of discriminatory treatment under either Title VII or CFEPA.  See, e.g., <u>Sumner v. U.S. Postal Service</u>, *supra;* <u>Hill v. Pinkerton Security & Investigation Services, Inc.</u>, 977 F.Supp 148 (1997). Claims of termination motivated by the use or request of FMLA, are also generally considered under the <u>McDonnell Douglas</u> burden shifting analysis.  See, e.g., <u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151 (1st Cir. 1998); <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319 (10th Cir. 1997) <u>Darboe v. Staples, Inc.</u>, 243 F.Supp.2d. 5, 15-16 (S.D.N.Y. 2003).

Once a plaintiff establishes a prima facie case of retaliation under Title VII/CFEPA or the FMLA the burden shifts to the defendant to proffer a legitimate non-discriminatory reason for the adverse employment action of which plaintiff complains.  If the defendant does so, all presumptions drop out of the case, and the plaintiff is left with the ultimate burden of proving that a desire to retaliate against her was the true motivation.  <u>Roge v. NYP Holdings</u>, 257 F.3d 164, 168 (2d Cir. 2001).  <u>Stonum v. U.S. Airways</u>, 83 F.Supp.2d 894, 899 (S.D.Ohio 1999) citing <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 805 (6th Cir. 1998).

In considering defendant's motion for summary judgment, there appears to be little reason to dispute that plaintiff can establish a prima facie case that her termination was

10

retaliatory under both Title VII/CFEPA and the FMLA. The issue upon which the Court requested further briefing was how the evidence of plaintiff's counsel's statement during settlement negotiations impacts the defendant's proffer of a legitimate non-discriminatory reason for termination. This section of this brief will discuss the minimal impact an order prohibiting any testimony about what plaintiff's counsel said in settlement negotiations would have on the summary judgment proceedings and trial.

For purposes of defendant's motion for summary judgment, the absence of any evidentiary support for Sonalysts' claimed legitimate non-discriminatory reason for termination has little significance. If the Court concluded that plaintiff had established a prima facie case under both Title VII/CFEPA and the FMLA it would then consider what the proferred legitimate non-discriminatory reason for termination was. The reason, without reliance on statements of counsel during settlement negotiations, would be that "We [Sonalysts'] understand . . .that you [have] no interest in returning to your position at Sonalysts." See Exhibit A, Termination Letter, read with the omission to reference to statements by plaintiff's counsel during settlement negotiations.

Toriello's testimony in his CHRO Affidavit (Exhibit B) can likewise be redacted to "We received information that Jeanne had no interest in returning to her position. This was consistent with the statements that Jeanne had repeatedly made to Lisa [Mackie – Sonalysts in-house counsel] and to Mrs. Hinkle and me. So we sent Jeanne a letter which, in part, read . . . . 'Therefore, we will consider your employment to have terminated effective as of August 31, 2000. . . .'" Toriello can be instructed to testify at trial without reference to any statements of opposing counsel during settlement negotiations, which would have resulted in deposition

11

testimony, attached as Exhibit C, reading as follows: "The next event after this, the meeting of the 27th of July and the call of the following week, which was the 2nd of August, I believe, I think that's correct, the next thing we heard from anybody was the letter we got from you alleging other harassment environment issues and . . . <u>we had heard from some people that she hadn't intended to return</u>. We heard basically that we had offered her this job, she didn't respond either away, and basically we got information . . . that she had no intention of returning and so she quit basically, and so administratively as we do, you know, terminations, voluntary or involuntary, or I stand corrected; as to administrate it or to close it out we sent her a letter terminating her as of the 31st of August as I recall." (Emphasis supplied.)

As the prior sworn statements of Mr. Toriello make clear, Sonalysts has at least alluded to evidence other than statements of plaintiff's counsel during settlement negotiations that it relied upon in terminating plaintiff's employment. Given the minimal burden upon defendant in proffering a legitimate non-discriminatory reason for termination, this evidence can be deemed sufficient. The weakness of the evidence of the legitimate non-discriminatory reason, however, should be considered by the court in determining whether there is enough evidence from which a jury could conclude that plaintiff has met her ultimate burden of proving pretext and that the real reason for her termination was discriminatory.

Ms. Bruno's deposition testimony was that she had not decided whether to return to the Media Group or not at the time of her termination and that she had never told anyone that she "would not" return to the Sonalysts' Media Group. See Transcript of Bruno Deposition attached as Exhibit D, at pp. 225-230. Viewing Bruno's testimony alongside Toriello's testimony, a jury could reasonably conclude that Ms. Bruno did not express an intention never to return to

12

Sonalysts, thus summary judgment for the defendant would be improper.  At trial, whether a finder of fact believes that Sonalysts' legitimately concluded Ms. Bruno had no intention of returning to Sonalysts prior to the date of the termination letter, will no doubt depend on what additional evidence, if any, Sonalysts can offer as to the "some people" who said Ms. Bruno did not intend to return to work and how credible the jury finds Ms. Bruno's testimony as to her intentions prior to receipt of the termination letter.

**(C)     If the Court determines that defendant will be allowed to offer evidence as to what plaintiff's counsel said during settlement negotiations, plaintiff must be allowed sufficient time to retain new counsel and prepare a supplemental objection to defendants motion for summary judgment before further action is taken by the Court.**

The immediately prior section of this brief contemplates the effect on the proceedings of an exclusion of evidence concerning statements made in settlement negotiations.  In contrast, in this section of the brief the Court asks the parties to assume that such evidence is deemed admissible.

The most significant impact that admission of statements of plaintiff's counsel during settlement negotiations will have is to render it necessary that plaintiff's counsel become a witness in this case.  Defendant has claimed that plaintiff's counsel said plaintiff had no intention of returning to employment at Sonalysts.  Even if offered for the purported purpose of proving defendant's "state of mind," the evidence will potentially be relied upon by the jury as establishing the fact that "plaintiff did not intend to return to work."  Thus, plaintiff will face the necessity of establishing that whatever was said by counsel in settlement negotiations was not properly relied upon or construed as a representation that plaintiff did not intend to work.  The

13

only effective way to do this is by having plaintiff's counsel testify as to exactly what was said, for what purpose and with what intent and understanding.

Rule 3.7 of the Rule of Professional Conduct provides that:

(a)     A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where:

   (1)     The testimony relates to an uncontested issue;

   (2)     The testimony relates to the nature and value of legal services rendered in the case;

   (3)     Disqualification of the lawyer would work substantial hardship on the client.

(b)     A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Clearly, plaintiff's counsel cannot continue to represent plaintiff if she is called to testify by plaintiff as to what was said, for what purpose and with what intent during settlement negotiations. Although subsection (b) of Rule 3.7 might, in some circumstances, allow another lawyer within the same law firm to represent a client when a lawyer becomes a necessary witness, it is unlikely to apply here. As a practical matter, when a lawyer must testify, especially on such a sensitive issue as how he or she conducted settlement negotiations, the lawyer has personal and professional concerns about what light the testimony will place him or her in. The second lawyer in the firm may be conflicted between advancing the interests of the legal partner and advancing the interests of the client, and, even in the absence of real conflict, there is an appearance of conflict that is best avoided.

14

In light of Rule 3.7, allowing defendant to offer evidence of plaintiff's counsel's statement during settlement negotiations will trigger the plaintiff's lawyer becoming a witness and plaintiff needing new counsel. Such new counsel should be allowed to get involved in these proceedings before any ruling is issued which is potentially adverse to the plaintiff's interests. For example, in this case, there is a question as to whether statements of plaintiff's counsel are to be considered in ruling on the motion for summary judgment. If they are to be considered, new counsel, not the lawyer who made the statements, should be given the opportunity to decide whether to submit an affidavit by the lawyer who made the statements and what should be included in that affidavit. Once the lawyer becomes a witness, they cannot effectively counsel their client as to how best to present their own testimony because their own interests could theoretically influence their advocacy, thus creating an appearance of improper conflict of interest.

In short, new counsel will be required for plaintiff if evidence of plaintiff's counsel's statements during settlement negotiations is deemed admissible. In order for plaintiff to have effective representation, such new counsel must be retained and given an opportunity to file a supplemental objection and/or affidavits to defendant's motion for summary judgment. Plaintiff's counsel proposes that somewhere between 90 and 120 days should be an adequate period of time to obtain new counsel and allow that attorney to submit such supplemental papers.

## III.    **CONCLUSION**

Pursuant to Rule 408 of the Federal Rules of Evidence, even when not expressly prohibited, the admission into evidence of statements made by counsel during settlement negotiations is strongly disfavored. Exclusion of such evidence in this case is required in order

to effectuate the purpose and policy behind Rule 408, and to avoid undue prejudice to the plaintiff. In particular, by reviewing the likely impact on further proceedings if the evidence is and is not admitted, as was done in section (B) and (C) of the argument portion of this brief, it is apparent that the prejudice to the plaintiff and to the smooth and efficient administration of justice if such evidence is admitted is quite profound, and far outweighs the necessity of the evidence for the purpose of proving the defendants' state of mind. For all the reasons set forth in this brief, all evidence of statements made by plaintiff's counsel during settlement negotiations should be excluded from evidence at trial and should not be relied upon by the court in ruling on defendant's motion for summary judgment.

Respectfully Submitted,
The Plaintiff, Jeanne Bruno
By her attorney:

SUSAN M. PHILLIPS
Federal Bar No. ct15529
Suisman, Shapiro, Wool, Brennan,
   Gray & Greenberg, P.C.
P.O. Box 1591
New London, CT 06230
(860) 442-4416
(860) 442-0495 (fax)
sphillips@sswbgg.com

16

## CERTIFICATION

I hereby certify that a copy of the foregoing was served by U. S. Mail, First Class and postage prepaid, this 11th day of December, 2003 as follows:

David A. Kulle
Erin K. O'Brien
Robinson & Cole LLP
280 Trumbull Street
Hartford CT 06103-3597

Susan M. Phillips

# Sonalysts, Inc.

215 Parkway North • P.O. Box 280        Waterford, CT 06385        (860) 442-4355 • Fax: (860) 442-5696

CERTIFIED MAIL
RETURN RECEIPT REQUESTED


September 1, 2000


Ms. Jeanne M. Bruno
10 Elliott Avenue
New London, CT  06320

Dear Jeanne:

    We understand that in a discussion our attorney, Alice DeTora, had with your attorney, Sue Phillips, on Thursday, August 31, 2000, your attorney represented that you had no interest in returning to your position at Sonalysts. Therefore, we will consider your employment to have terminated effective as of August 31, 2000.

    We will need you to return all Sonalysts' property (including all written material and computer files) in your possession. Please contact Lisa Mackie at (860) 442-4355 ext.411 to arrange for a mutually convenient time for you to return the property. If you have any personal belongings remaining at Sonalysts, we can arrange for you to pick them up at that time as well.

    Your group health insurance coverage terminates effective as of August 31, 2000. Lisa Gray will be sending you information concerning your rights to continue such coverage under COBRA.

Sonalysts, Inc.

Andrew N. Toriello
President


HART1-891236-1
09/05/00 4:36 PM

## AFFIDAVIT OF ANDREW N. TORIELLO

I, Andrew N. Toriello, being duly sworn, do depose and say as follows:

I am over the age of 18 and I believe in the obligations of an oath.

This affidavit is submitted in support of the response of Sonalysts, Inc. to a charge of discrimination filed by Jeanne Bruno with the Commission on Human Rights and Opportunities.

I am the Chief Operating Officer and President at Sonalysts, Inc.

On Thursday afternoon, July 13, 2000 I received a letter from Ms. Jeanne Bruno. In it, she stated that she thought she was being demoted because she refused to go forward with a sexual harassment complaint against an important customer of Sonalysts, and didn't think she would be treated fairly in her job in Sonalysts' Media Group. Prior to receiving this letter, I had no knowledge of any issues concerning Ms. Bruno. The next day, I asked Mr. Ralph Guardiano, who is a Senior Vice President and the Group Leader of the Media Group in which Ms. Bruno worked, to explain the situation to me.

Ralph said that the previous Friday, July 7, Ms. Bruno had met with her supervisor, Mr. John Visgilio, regarding performance issues. Jeanne's position in Sonalysts' Media Center Group is that of a coordinating producer, and she deals with primarily one customer, the Mohegan Sun (M/S) Casino. Ralph said that before the meeting, he and John talked in detail about what needed to be said to Jeanne because there were several incidents that showed her performance had been deteriorating. John was to point out to her that she had missed several important weekly meetings with her customer, she had sent an ad that we were developing for the customer using 2 different

fonts, and proofreading was not done on a separate advertisement before 20,000 color copies were printed, so that dates for concerts were incorrect, performers' names were misspelled and Sonalysts might have to bear the expense of the reprinting. At this meeting Jeanne was also going to be told that her assistant, Mr. Elliot Wrann, who was leaving Sonalysts would not be replaced. The reason that we weren't going to replace him was that for the preceding 4 months or so, I had been putting pressure on Ralph to cut his costs – his discretionary funding was way over budget, and I wanted him to do everything that he could to reduce costs within his group. Ralph decided that one of the ongoing tasks that Jeanne and her assistant had done for Mohegan Sun would be given to another coordinating producer who did not have enough to keep her busy all of the time, and so overall costs would be reduced. Although Ralph was not in the meeting with Ms. Bruno, he said that she came to see him immediately when it was over. She told him to sit down and not say anything. Ralph said that it was obvious that she was very angry. After she finished telling him off, she left his office and went into her own which was nearby. He heard her slamming doors and throwing things before she left for the evening.

I then asked Ralph about the incidents with Mr. David Casey of Mohegan Sun that Ms. Bruno alluded to in her letter. He said that he knew of only one: there had been a conversation among Jeanne, Mr. Casey, and Mr. Jake Kahn, a Sonalysts employee, in late May. This incident took place in the foyer to Sonalysts' Media Center about a week or so before a visit that Sonalysts was setting up on June 8 -11 for various movie studio executives to familiarize themselves with Sonalysts' movie production capabilities and the attractions of SE Connecticut (the "fam trip"). We were having trouble locating hotel

rooms for all of the guests, and Jeanne jokingly offered to lend her house (which is located on a beach in New London) for the occasion. She made this statement to Mr. Casey and Jake. Jake said something like: "If you come with it, with a French maid's outfit on", and David Casey made some additional remarks. Ralph said that Jeanne, who was very angry, had immediately come to his office, followed by Jake. Jake apologized to Jeanne at once. Ralph said that he asked her what she wanted him to do about this incident – he said he told Jeanne that she could do anything she wanted, including slapping David Casey, and that he (Ralph) would even be willing to lose the account if the Mohegan Sun people didn't like what Sonalysts decided to do about this incident. Ralph said that Jeanne wanted to think about it.

The next day, Ralph said that he and Jeanne spoke about the incident again, and Jeanne asked him to call Mr. Mitchell Etess, a Vice President of M/S with whom Ralph works very closely, and tell him about the incident. Ralph called Mitchell that day. Ralph said that Mr. Etess wanted Jeanne to come in and file a formal complaint about Mr. Casey's behavior, but that Jeanne said that she didn't want to do that, and would handle the situation with David Casey herself, if something like that ever happened again.

Ralph finished telling us of these events around 7 pm Friday evening, and the next day, I spoke with Mr. David Hinkle, the Chairman of Sonalysts' Board of Directors. We agreed that Mr. Hinkle would speak to his wife, Muriel N. Hinkle, Sonalysts CEO, about this situation, and that Mrs. Hinkle would call Jeanne on Sunday and try to set up a meeting with us early that next week. Jeanne agreed to come in on the next day, Monday, July 17 to meet with Mrs. Hinkle and me.

Mrs. Hinkle and I wanted to hear Jeanne's story directly from her, so what we did mostly was listen. We first asked her about the incidents with David Casey. Jeanne mentioned three instances in which David engaged in behavior that she thought was lewd. She said that the first time had involved some gestures, and had been in a social setting in New York City, at an awards presentation and the celebration after it in February Jeanne said that she spoke with Ralph Guardiano after this incident. She said that she and Ralph agreed to excuse the incident because it had happened in a social setting and that they decided they didn't need to take any action. Jeanne said that a second incident had occurred sometime between the first and third and involved Mr. Casey making gestures at Jeanne. It was unclear if Jeanne said anything about this to any other person at Sonalysts. She then described the third incident involving the remark about the French maid's costume. Jeanne said that David's remarks had included the reference to the French maid's outfit "with nothing on underneath". After that incident, Jeanne said that she went immediately to Ralph Guardiano and complained about David Casey's behavior as well as that of Jake Kahn. Jeanne said she told Jake to "go to hell". Jake followed her into Ralph's office and apologized for his remark. Jeanne said she told Ralph that she was really upset by this incident. Ralph told Jeanne to think about what she wanted to do about the situation. Jeanne said that about a day and a half went by and nothing was done, but then Ralph decided that he would talk with Mr. Mitchell Etess, a Vice President at Mohegan Sun, about David Casey. After meeting with Mitchell, Jeanne said that Ralph asked her to file a formal written complaint about David with Mohegan Sun. Jeanne told us that Ralph indicated Mitchell wanted to use the situation to fire David because of other performance issues. Jeanne told Ralph that she wanted to handle