it herself and would not file a complaint or allow her situation to be the reason that David was fired.

The next incident Jeanne spoke of took place on July 7, the last day Jeanne worked, but the way Jeanne told it, at first I didn't realize that over 5 weeks had gone by since the incident with Casey. Jeanne said that Ralph and Mitchell Etess drove back from a meeting that took place that morning. She said that she believed they decided to take some sort of retaliatory action against her during that car ride because she wouldn't go forward with the complaint against Casey. That afternoon, she met with John who criticized her job performance – that her follow-through was poor and she wasn't proofing copy for the client's advertisements. Jeanne said that after her meeting with John, she went into Ralph's office and told him to "just shut up" - that he and John had not handled themselves well and she was very angry with them.

Jeanne told us that she thought Ralph and John were trying to get her to fail at her job; she was responsible for all of the Mohegan account and she couldn't do it without an assistant. She said she was concerned that David Casey's behavior would get worse.

Jeanne said that the situation in the Media Group had been better when Keith Daly was the supervisor of all of the coordinating producers – there was a better division of responsibilities. Now, John Visgilio is both the Art Director and the head of the coordinating producers and Jeanne said that was a conflict of interest.

Jeanne said that she would like to stay at Sonalysts, but didn't think she would be treated fairly in the Media Center. She said that even if Ralph talked with her and opened a dialog with her, she wouldn't trust him, and he probably wouldn't do it anyway. She said that she didn't think going back to the Media Center was an option.

Mrs. Hinkle and I promised Jeanne that we would investigate her allegations and get back to her. We told her that Lisa Mackie would be in touch with her about the leave of absence issues. Lisa's contacts with Jeanne are described in her affidavit and those descriptions match what Lisa had told me at the time of her conversations with Jeanne. In the next several days I met with John Visgilio, Jake Kahn, Tracy Wargo, and again with Ralph Guardiano.

John and I discussed in detail the events of July 7 and the general nature of their relationship in the months leading up to that date. He told me that July 7 was not the first time he had to speak to Jeanne about her performance – there had been several other incidents where work that she was responsible for had been done incorrectly – mistakes that primarily involved proofreading and other detail-oriented tasks. John became Jeanne's supervisor in April 2000, after Keith Daly left. Keith had recommended that Jeanne be given a mid-year raise (because she hadn't received one at the end of the fiscal year in November, 1999), and John thought that giving her a raise at mid-year would be a good way to begin his direct supervisory relationship with her. John told me that Jeanne was very defensive during their July 7 meeting, and accused him of always defending the design group (which he also supervised) in any issues involving the account representatives. John said that he told Jeanne that he knew none of the issues he brought up was black and white, but they needed to focus on the customer, and that he was sure she could do all of the things that needed to be done. It was at this meeting that John told Jeanne that they would not be replacing her assistant Elliot Wrann, and told her of the plans to transfer some of her workload to another coordinating producer, Mary Jo

Rathbun, who did not have enough to do. He said Jeanne was not happy with this decision.

John told me that Jeanne had scheduled the following week as her vacation a number of weeks before, but when they learned that Elliot was leaving and his last day would be Friday, July 14, Jeanne decided that she would postpone her vacation until later. John said he was quite surprised to get a voice mail from Jeanne that evening saying she was going to take vacation the next week. John talked with Ralph and they decided that Jeanne needed to work with Elliot during last week in the office. John said he called and left three messages with Jeanne, requesting her to work during the upcoming week as they had agreed, but Jeanne never responded to any of his calls and did not work that week.

I have read the affidavits that are being submitted by Tracy Wargo and Ralph Guardiano and they match the recollections that I have of their accounts to me of the same events. I was interested in the fact that Tracy said that Jeanne always had "issues" with John and during the first week of July, Jeanne had told Tracy that she wanted to report directly to Ralph Guardiano. It is difficult for me to understand how Jeanne's attitude towards Ralph could have changed so quickly – during an hour's meeting with her supervisor – and drastically, so that she didn't even want to give him a chance to resume their working relationship.

My interview with Sonalysts' employee Jake Kahn confirmed the incident with David Casey and the comment about the "French maid's outfit". Jake said that Jeanne told David and him to "F--- off" in that conversation. He also confirmed that he

apologized to Jeanne at once about his comments and that she told him she wasn't angry with him.

I looked through the company's staffing needs outside of the Media Center to see if there was another position which required Jeanne's qualifications, but all of the jobs open required individuals who were qualified to do engineering or software development work except for an administrative position which paid about half of what Jeanne had been earning.

Muriel and I spoke and we decided that Sonalysts could not put Jeanne back in a work situation where she would have almost daily contact with a person whose conduct over several months she had found harassing. I understood that Jeanne had told Ralph that she "could handle" David Casey right after the late May incident, but from her letter in mid-July it was obvious that the occurrences with Casey still bothered her immensely. I was concerned that Jeanne would suffer another harassing incident from Casey and would blame Sonalysts for requiring her to continue to work with a person whose unacceptable conduct she had brought to the attention of her management.

So, since there were no jobs available in the rest of the company, I went back to John and Ralph and we talked about a position for Jeanne in their organization which would not involve working with Mohegan Sun. They told me that there were a number of smaller accounts which they thought could be developed into much larger ones if someone paid more attention to them. I told them that Jeanne did not trust them and believed that they would not treat her fairly. They assured me that they were willing to work with Jeanne – that they thought her client skills were excellent, and that she could certainly make a positive contribution to the growth of the Media Group's business. I

told them that either I or Dave Samuelson, Sonalysts' Technical Director, (or both) would be personally involved in monitoring Jeanne's performance and treatment when she came back to work.

On July 27, Mrs. Hinkle, Lisa Mackie and I met with Jeanne. Mrs. Hinkle's affidavit details that meeting and her statements match my recollections. Jeanne had promised to call us back by Tuesday of the following week and when she hadn't called by Wednesday, Lisa and I called her. We were only able to leave a message on her answering machine, telling her we hoped she was well and that we were looking forward to hearing from her about our offer. Jeanne never responded and the next thing that happened was we received a letter from Ms. Susan Phillips, a lawyer who said she represented Jeanne in issues resulting from her employment at Sonalysts. The letter stated that Ms. Phillips would present "…facts, of which you are probably not yet aware, concerning the long-standing hostile environment Ms. Bruno has experienced within the Media Group". I had no idea of what these "facts" could be, because Jeanne had raised no other complaints during any of her conversations with me and Mrs. Hinkle or with Lisa Mackie (although she had ample opportunity), and none of the people that we had interviewed had mentioned Jeanne complaining about anything else.

I spoke with Ralph about these unspecified allegations and he spoke with Ms. Sue Ballestrini who also worked in the Media Center and was, for a time, a confidant of Jeanne's. We had not interviewed her before because she had no independent knowledge of any of the David Casey incidents. Ralph learned from Ms. Ballestrini that Jeanne had been involved in a relationship with Keith Daly for several months, which ended a month or so before he left Sonalysts on March 31.

So Lisa Mackie and I met with Sue Ballestrini on August 14. Sue said that she didn't know anything about any of these situations except what Jeanne had told her. Sue confirmed that Jeanne told her that she was in a romantic and sexual relationship with Keith Daly. Sue believed from Jeanne's conversations that it was a totally consensual relationship, although it was very tumultuous. Sue did not believe that Ralph knew of the relationship at all. The material included in Sue's affidavit is consistent with what I remember she told Lisa and me. Lisa also called Keith to discuss his relationship with Jeanne and her affidavit contains an account of their phone conversation.

We received information that Jeanne had no interest in returning to her position. This was consistent with the statements that Jeanne had repeatedly made to Lisa and to Mrs. Hinkle and me. So we sent Jeanne a letter which, in part, read " ...your attorney represented that you had no interest in returning to your position at Sonalysts. Therefore, we will consider your employment to have terminated effective as of August 31, 2000...."

I hereby certify that the foregoing facts are true to the best of my knowledge and belief.

_Andrew N. Toriello_

Subscribed and sworn to before me
this 15th day of November, 2000.

Notary Public/Commissioner
of the Superior Court
My Commission Expires:

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEANNE M. BRUNO | :   NO. 3:01CV1501(SRU) |
|         vs. | : |
| | : |
| SONALYSTS, INC. | :   APRIL 23, 2003 |

DEPOSITION OF ANDREW N. TORIELLO JR.

COPY

Jane M. Gingerella, LSR, RPR
Licensed Shorthand Reporter #00392
Shea & Driscoll, L.L.C.
16 Seabreeze Drive
Waterford, CT  06385

SHEA & DRISCOLL   (860) 443-3592

73

1    a Thursday as I recall, if the 27th of July is a

2    Thursday.  She said she would get back to us the next

3    day or Monday or Tuesday at the latest as to whether

4    she would come back under, in that role.

5        Q.  And then what happened?

6        A.  She didn't get back to us and so Lisa and I

7    called her on Wednesday and she wasn't home so we left

8    a message, said, you know, we have got this opening,

9    we are, you know, we want to know what your decision

10   is and could you please get back to us.

11       Q.  Who in the media group was going to handle the

12   Mohegan Sun account after Jeanne Bruno was removed?

13       A.  Well, Mary Jo Rathbun would handle part of it

14   and then we would figure out, you know, Ralph would

15   have to jump in, people would have to jump in and

16   coordinate until we found somebody to pick it up.

17       Q.  And what happened after you and Miss Mackie

18   left a message for Jeanne Bruno the following

19   Wednesday?

20       A.  She didn't respond.  Nothing heard Wednesday,

21   Thursday or Friday.

22       Q.  And how did it come about that you sent

23   Jeanne Bruno a letter saying that her employment was

24   terminated?

25       A.  The next event after this, the meeting of the

SHEA & DRISCOLL   (860) 443-3592

74

1   27th of July and the call the following week, which

2   was the 2nd of August, I believe, I think that's

3   correct, the next thing we heard from anybody was the

4   letter we got from you alleging other harassment

5   environment issues and discussions between you and

6   Lisa, and during those discussions we had heard from

7   some people that she hadn't intended to return.  We

8   heard basically that we had offered her this job, she

9   didn't respond either way, and basically we got

10  information from you that she had no intention of

11  returning and so she quit basically, and so

12  administratively as we do, you know, terminations,

13  voluntary or involuntary, or I stand corrected; as to

14  administrate it or to close it out we sent her a

15  letter terminating her as of the 31st of August as I

16  recall.

17      Q.  You indicated that you never spoke to

18  Mitchell Etess about Jeanne Bruno.  Did you ever

19  contact anyone at Mohegan Sun to talk about

20  Jeanne Bruno?

21      A.  No.

22      Q.  After your interviews with Tracy Wargo and

23  Jake Kahn and John Visgilio, did you have any further

24  questions for Jeanne Bruno?

25      A.  No, only was she going to come back to work.

SHEA & DRISCOLL   (860) 443-3592

79

U.S. DISTRICT COURT
DISTRICT OF CONNECTICUT


          I, Jane M. Gingerella, LSR, RPR, a Notary
Public duly commissioned and qualified within and
for the State of Connecticut, do hereby certify:
          ANDREW N. TORIELLO JR. was by me duly
sworn in the within-entitled cause;
          that said deposition was reported by
me, a Licensed Shorthand Reporter, was
transcribed by me and is a true and complete
transcription of all testimony given by said
witness.
          I further certify that I am not a relative,
counsel or attorney of any party or otherwise
interested in this action.
          Reading and signing of the transcript was
requested by the parties involved upon completion
of the deposition.
          IN WITNESS WHEREOF, I have hereunto set
my hand and seal this _____ day of _____,
2003.


_____
          Jane M. Gingerella, LSR, RPR
          Licensed Shorthand Reporter #00392
          Court Reporter - Notary Public
          My commission expires December 31, 2005.


SHEA & DRISCOLL   (860) 443-3592

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * *
                              *    CIVIL ACTION NO.
JEANNE BRUNO,                 *    3:01CV1501(SRU)
           PLAINTIFF,         *
                              *
VS.                           *
                              *
SONALYSTS, INC.,              *
           DEFENDANT.         *
                              *
* * * * * * * * * * * * * * * *
```

COPY

---------------------------------------------------

DEPOSITION OF:  JEANNE BRUNO

---------------------------------------------------

Taken before Irene A. Janazzo, Registered
Professional Reporter, Lic./Reg. No. 00085, and
Notary Public in and for the State of Connecticut,
pursuant to the Federal Rules of Civil Procedure,
at the offices of Robinson & Cole, LLP, 280 Trumbull
Street, Connecticut, on March 12, 2003, commencing at
10:12 a.m.


BRANDON SMITH REPORTING SERVICE, LLC
44 Capitol Avenue
Hartford, CT  06106
Tel:  (860) 549-1850
Fax:  (860) 549-1537

Page 222

1                MS. O'BRIEN:  All right then.

2    BY MS. O'BRIEN:

3    Q    Other than the meeting on the 7th, were there

4         any other aspects of the hostile work

5         environment that you discussed with Andy and

6         Muriel?

7    A    No.

8    Q    At the time that this letter was written, had

9         you made a decision about whether or not you

10        were going to accept the offer of the new

11        position extended by Andy and Muriel?

12   A    No, I had not made a decision.

13   Q    When did you -- sorry.  Strike that.

14              Did you ever convey to anyone at

15        Sonalysts what you would prefer to have happen

16        other than if you did not accept the offered

17        position that they extended to you?

18              MS. PHILLIPS:  Objection as to form.

19   BY MS. O'BRIEN:

20   Q    Do you understand the question?

21   A    No.  Actually, can you repeat it or restate it?

22   Q    Sure.  During the period of time that you were

23        pondering whether or not to accept the offer of

24        the position that Andy and Muriel had extended

25        to you, did you ever convey either directly or

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 223

1      indirectly any other alternatives that you

2      would be willing to consider?

3    A    I did not convey.

4    Q    Did you have any interest in voluntarily

5      resigning your employment at Sonalysts in

6      exchange for a severance package?

7              MS. PHILLIPS:  Objection.  It goes to

8          offers to compromise.  It's irrelevant as

9          well.

10             MS. O'BRIEN:  It's not irrelevant if

11         it goes to whether or not -- it goes to

12         state of mind as to whether or not

13         Ms. Bruno had, in fact, resigned.

14             MS. PHILLIPS:  She's already indicated

15         that she hadn't made a decision.  I suppose

16         a question I wouldn't object to would be

17         had you made a decision at any time prior

18         to receiving the letter from Andy Toriello.

19             MS. O'BRIEN:  I'm entitled to test the

20         veracity of whether Ms. Bruno had, in fact,

21         made a decision, and I'm entitled to

22         question her about her state of mind

23         regarding her willingness to return to work

24         at Sonalysts.

25   BY MS. O'BRIEN:

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 224

```
 1    Q    For that reason, I am asking if you had ever
 2         contemplated resigning from Sonalysts in
 3         exchange for a severance.
 4              MS. PHILLIPS:  And I objected to that
 5         question.
 6              MS. O'BRIEN:  That question does not
 7         go into any sort of specific settlement.  I
 8         did not even ask if settlement was
 9         extended.  I'm simply asking if it was
10         something that was contemplated.  It goes
11         to state of mind, and it is relevant, and
12         it is admissible.
13              MS. PHILLIPS:  I'll allow you to
14         answer that question yes or no.
15    A    No.
16   BY MS. O'BRIEN:
17    Q    You never contemplated that?
18    A    No.
19    Q    Did you ever contemplate what references
20         Sonalysts would give you if you were to resign?
21              MS. PHILLIPS:  Objection.  She just
22         indicated that she never contemplated
23         resigning.
24              MS. O'BRIEN:  She said she never
25         contemplated resigning in exchange for
```

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 225

1             severance.  This is a different question.

2                  MS. PHILLIPS:  Fair enough.

3    A    What was the question again?

4    BY MS. O'BRIEN:

5    Q    Did you ever contemplate what references

6         Sonalysts would give you if you were to resign?

7    A    No.

8    Q    Okay.  Was it your position that you would not

9         return to work at Sonalysts if you had to work

10        in the media department?

11                 MS. PHILLIPS:  Objection, vague.

12   BY MS. O'BRIEN:

13   Q    You can answer if you understand the question.

14                 THE DEPONENT:  You're objecting.

15                 MS. PHILLIPS:  I'm objecting on the

16            basis that I think the question is unclear.

17            It's not limited to any particular period

18            of time.  If you understand the question

19            and think you know what period of time

20            she's referring to, you're welcome to

21            answer it.

22   A    What was the question again?

23                 MS. O'BRIEN:  Could you read back the

24            question.

25

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 226

```
 1                    (Reporter read the requested
 2                    material.)
 3
 4    A    That was still an open -- it was still up for
 5         discussion.
 6    BY MS. O'BRIEN:
 7    Q    Okay.  Isn't it true that you told Andy and
 8         Muriel and Lisa on several occasions that you
 9         would not work in the media group?
10    A    I don't think I told them that.  I think that
11         it was talked that I would prefer not to.  I
12         never told them I wouldn't.
13    Q    You never said on even one occasion, "I do not
14         want to work in the media group"?
15              MS. PHILLIPS:  Objection,
16           mischaracterizes her testimony.
17              MS. O'BRIEN:  I'm asking a follow-up
18           question to clarify the testimony.
19    BY MS. O'BRIEN:
20    Q    Did you ever say even on one occasion, "I do
21         not want to work in the media group"?
22    A    I did not put it that way, no, that I recall.
23    Q    Did you ever say, "I will not work in the media
24         group"?
25    A    No.  My preference was not to return to work in
```

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 227

1    the media group under the existing -- within

2    the existing situation.

3  Q  Under what circumstances would you have

4    returned to the media group?

5  A  I can't even begin to -- I don't know.  That

6    would be a conversation that would have to be

7    talked out.

8  Q  During the unemployment compensation hearings,

9    you offered several answers in response to a

10    very similar question so I'm going to ask you

11    if you still agree with those answers or if

12    you've changed your mind.  You indicated that

13    you would return to work in the media group if

14    you had a different supervisor and if

15    protections were put in place to prevent

16    against retribution.

17  A  I would say I would agree with that still to

18    this day.

19  Q  So under those circumstances, you would have

20    been willing to return to work in the media

21    group?

22  A  Yeah.

23  Q  Are there any other circumstances under which

24    you would be willing to work in the media

25    group?

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003                                                      Jeanne Bruno

Page 228

```
 1    A    No, as well as maintain -- you know, continue
 2         working on the account that I was -- be given
 3         back my job responsibilities.
 4    Q    When you say given back your job
 5         responsibilities, are you referring to working
 6         on the Mohegan account with an assistant as you
 7         did prior to July 7th or are you referring to
 8         working on the Mohegan account as opposed to
 9         the other account they offered you?
10    A    Working within the existing parameters that I
11         was the last day that I was there physically.
12    Q    I don't understand what that means.
13    A    Meaning up until 6 o'clock that night managing
14         the Mohegan account as a senior coordinating
15         producer with an assistant.
16    Q    Okay.  So those -- and just so I'm clear, if
17         you were put back in the media group with a
18         different supervisor and with protections in
19         place to protect against retribution but you
20         were assigned to the Mohegan account without
21         the newsletter and the direct mail, you would
22         not have been willing to go back?
23    A    I can't answer that right now.  I don't know.
24         I mean, there would have to be discussion, and
25         it would be a professional discussion, not a --
```

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 229

1     with people sitting down and discussing how the

2     process was going to work and that sort of

3     thing.

4    Q    I'm not offering you this thing.

5    A    I'm trying to answer that because I couldn't

6         give you a yes or no right now.  I mean,

7         certainly I'd want to work with people, but in

8         terms of working through something -- there

9         would have to be a discussion.  I can't say a

10        blanket yes or no.

11   Q    Okay.  So when you -- let me ask another

12        question.  If you were offered the position of

13        working on the Mohegan Sun account with an

14        assistant with all the retainers that you had

15        but you were still working under the same

16        supervision, would you have been willing to

17        return to work at Sonalysts?

18   A    I don't know.  I don't know.

19   Q    Let me just clarify one thing.  During July --

20        the summer of 2000, if I had asked you those

21        questions, would your answer have still been "I

22        don't know" or has your position changed over

23        the past couple of years?

24   A    No.  It would have been "I don't know."

25   Q    Okay.  Did you ever indicate to anyone that you

3/12/2003

Bruno vs Sonalysts, Inc.

Jeanne Bruno

Page 230

| | | |
|---|---|---|
| 1 | | had no interest in ever coming back to |
| 2 | | Sonalysts? |
| 3 | A | No. |
| 4 | Q | While you were working at Sonalysts, were you |
| 5 | | aware of any other employees who may have taken |
| 6 | | medical leave? |
| 7 | A | No.  I'm just trying to think of pregnancies. |
| 8 | | No. |
| 9 | Q | When did you determine that you needed to take |
| 10 | | medical leave? |
| 11 | | MS. PHILLIPS:  I'm going to object to |
| 12 | | the form of the question. |
| 13 | | MS. O'BRIEN:  Objections as to form |
| 14 | | are noted for the record. |
| 15 | BY MS. O'BRIEN: | |
| 16 | Q | But you can answer. |
| 17 | | THE DEPONENT:  Can I just ask what |
| 18 | | does that mean to object to the form of the |
| 19 | | question? |
| 20 | | MS. PHILLIPS:  It means that I think |
| 21 | | it was asked in a way that makes it unclear |
| 22 | | or misleading. |
| 23 | A | And the question was when did I -- |
| 24 | BY MS. O'BRIEN: | |
| 25 | Q | When did you determine that you needed to take |

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a

Bruno vs Sonalysts, Inc.

3/12/2003

Jeanne Bruno

Page 298

```
 1                    CERTIFICATE OF REPORTER
 2              I, Irene A. Janazzo, a Notary Public duly
 3    commissioned and qualified in and for the State of
 4    Connecticut, do hereby certify that pursuant to
 5    notice, there came before me, on the 12th day of
 6    March, 2003, the following named person, to wit:
 7    JEANNE BRUNO, who was by me duly sworn to testify to
 8    the truth and nothing but the truth; that she was
 9    thereupon carefully examined upon her oath and her
10    examination reduced to writing under my supervision;
11    that this deposition is a true record of the
12    testimony given by the witness.
13              I further certify that I am neither
14    attorney nor counsel for, nor related to, nor
15    employed by any of the parties to the action in which
16    this deposition is taken and further that I am not a
17    relative or employee of any attorney or counsel
18    employed by the parties hereto, or financially
19    interested in the action.
20              IN WITNESS THEREOF, I have hereunto set my
21    hand and affixed my seal this 24th day of March,
22    2003.

23
24            Irene A. Janazzo, RMR, LSR
              Notary Public, Lic. No. 00085
25    My commission expires:  December 31, 2003
```

Brandon Smith Reporting Service

2ffd32f6-1e01-4750-865c-519ad317119a