UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEANNE M. BRUNO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CIVIL NO. 3:01CV1501 (MRK) |
| | : |
| SONALYSTS, INC., | : |
| | : |
| Defendant. | : |

**MEMORANDUM OF DECISION**

Plaintiff Jeanne Bruno sues her former employer, Sonalysts, Inc., for allegedly retaliating against her for complaining of sexual harassment in violation of Title VII of the Civil Rights Act of 1965 as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Connecticut Fair Employment Practices Act, Gen. Stat. § 45a-60 *et seq*. ("CFEPA"). Ms. Bruno also claims that Sonalysts retaliated against her for requesting leave under the Family and Medical Leave Act 29 U.S.C. § 2601 *et seq*. ("FMLA"). Currently before the Court is Defendant's Renewed Motion for Summary Judgment [doc. #68]. For the following reasons, Defendant's motion is GRANTED in part and DENIED in part.

I.

Unless otherwise noted, the following facts are not in dispute.[1] Ms. Bruno began work at

---

[1] The relevant documents from which the facts are drawn include: Defendant's Local Rule 56(a)(1) Statement of Undisputed Facts [doc. #46] ("Def.'s 56(a)(1) Stmt."); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [doc. #51] ("Pl.'s. Opp."); Plaintiff's Local Rule 56(a)(2) Statement [attached to doc. #51] ("Pl.'s 56(a)(2) Stmt."); Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [doc. #57] ("Def.'s Reply"); Transcript of November 21, 2003 Oral Argument [doc. #61] ("Tr."); Plaintiff's Supplemental Brief on Rule 408 Issues [doc. #63] ("Pl.'s Supp. Br."); Defendant's Supplemental Memorandum of Law in Support of Summary Judgment [doc. #64] ("Def.'s Supp.

Sonalysts in December of 1998 as a Coordinating Producer in the company's Media Center where she served as a liaison between clients and the creative personnel at Sonalysts. Sonalysts provides a wide range of engineering and multimedia services. Ms. Bruno was assigned to the Mohegan Sun account, one of the firm's largest accounts, and to some other smaller accounts. Def.'s 56(a)(1) Stmt. ¶ 1; Pl.'s 56(a)(2) Stmt. ¶ 1; Pl.'s Opp. at 3. Sometime around the beginning of June 2000, Ms. Bruno told Ralph Guardino, the Group Leader of the Media Center, that an employee of Mohegan Sun, David Casey, had made inappropriate comments to her, including one about a "French maid's outfit." Def.'s 56(a)(1) Stmt. ¶ 3; Pl.'s 56(a)(2) Stmt. ¶ 3. Immediately after speaking with Ms. Bruno, Mr. Guardino reported the incident to Mitchell Etess, Mr. Casey's supervisor at Mohegan Sun. Within a day, Mr. Etess responded and told Mr. Guardino that he would like Ms. Bruno to file a formal written complaint against Mr. Casey so that Mohegan Sun could take disciplinary action against Mr. Casey.

    Mr. Guardino relayed Mr. Etess' request for a formal written complaint to Ms. Bruno. Def.'s 56(a)(1) Stmt. ¶ 4; Pl.'s 56(a)(2) Stmt. ¶ 4. However, Ms. Bruno refused to file a formal complaint against Mr. Casey. Def.'s 56(a)(1) Stmt. ¶ 5; Pl.'s 56(a)(2) Stmt. ¶ 5. At her deposition, Ms. Bruno testified that Mr. Guardino mentioned to her that Mr. Etess was unhappy with Mr. Casey's performance for reasons other than his treatment of Ms. Bruno. In response, Ms. Bruno told Mr. Guardino that she did not want Mr. Etess to use her complaint as what she felt was a pretext for firing Mr. Casey. *See* Bruno Dep. at 122-23, Ex. 1 [doc. #46].

---

Mem."); Pl.'s Reply Brief on Rule 408 Issues [doc. #64] ("Pl.'s Reply Br."); Defendant's Reply to Plaintiff's Supplemental Brief on Rule 408 Issues [doc. #65] ("Def.'s Rep. to Supp. Br."); Plaintiff's Supplemental Memorandum of Law in Opposition to Summary Judgment [doc. #72] ("Pl.'s Supp. Mem. Opp."); and Defendant's Reply to Plaintiff's September 17, 2004 Supplemental Memorandum [doc. #75] ("Def.'s Supp. Reply").

On July 7, 2000, John Visiglio, Ms. Bruno's supervisor, met with Ms. Bruno and they discussed a number of things including some issues concerning Ms. Bruno's performance. Def.'s 56(a)(1) Stmt. ¶ 6; Pl.'s 56(a)(2) Stmt. ¶ 6. Mr. Visiglio informed Ms. Bruno that her assistant Elliot Wrann, who had announced his resignation several weeks earlier, would not be replaced. Instead, Mary Jo Rathbon, another Coordinating Producer, would take on some of the Mohegan Sun work. *Id*. Prior to that meeting, Ms. Bruno considered postponing her vacation plans for July 10-15 so that she would be at work during Mr. Wrann's last week. As a result of her meeting with Mr. Visiglio, Ms. Bruno changed her mind and informed Mr. Visiglio and Mr. Guardino via voice mail that she would be taking the next week off. Def.'s 56(a)(1) Stmt. ¶ 7; Pl.'s 56(a)(2) Stmt. ¶ 7.

On Thursday July 13, Andrew Toriello, the president of Sonalysts, received a letter from Ms. Bruno while she was on vacation. The letter stated that "I believe that my unwillingness to participate in a scheme to fire David Casey rather than any change in my performance has prompted the negative treatment I am receiving." Letter of 7/13/00, Ex. 6 [doc. #47]; Def.'s 56(a)(1) Stmt. ¶ 9; Pl.'s 56(a)(2) Stmt. ¶ 9. The next day, July 14, Mr. Guardino and Mr. Toriello received a letter from a licensed clinical social worker, Susan Paulson, who stated that Ms. Bruno was taking FMLA leave. Def.'s 56(a)(1) Stmt. ¶ 15; Pl.'s 56(a)(2) Stmt. ¶ 15. Within a few days of receiving the letter from Ms. Paulson, Dr. Ann Pierson, a physician employed by Sonalysts, and Lisa Mackie, Sonalysts' General Counsel, both attempted to obtain more specific information from Ms. Bruno and her health care providers regarding Ms. Bruno's medical condition and the duration of her claimed FMLA leave. Def.'s 56(a)(1) Stmt. ¶¶ 18-19; Pl.'s 56(a)(2) Stmt. ¶¶ 18-19.

On July 16, Muriel Hinkle, Sonalysts' Chief Executive Officer, called Ms. Bruno to set up a meeting for July 17 to discuss the allegations set forth in her July 13 letter to Mr. Toriello. Def.'s 56(a)(1) Stmt. ¶ 10; Pl.'s 56(a)(2) Stmt. ¶ 10. At that meeting, Ms. Bruno told Ms. Hinkle about a number of incidents that involved inappropriate behavior by Mr. Casey. Def.'s 56(a)(1) Stmt. ¶ 12; Pl.'s 56(a)(2) Stmt. ¶ 12. Ms. Bruno also told Ms. Hinkle that she did not wish to continue working in the Media Center and that although she would like to remain "in the Waterford area," she would prefer to "work on the government side as a coordinating producer." Bruno Dep. at 209, Ex. 1 [doc. #47]; Def.'s 56(a)(1) Stmt. ¶ 13; Pl.'s 56(a)(2) Stmt. ¶ 13. Ms. Hinkle told Ms. Bruno that Sonalysts would investigate her complaints and attempt to find her an alternate position at the company, outside the Media Center. Def.'s 56(a)(1) Stmt. ¶ 14; Pl.'s 56(a)(2) Stmt. ¶ 14.

Less than two weeks later, on July 27, while Ms. Bruno was still on leave, Mr. Toriello, Ms. Mackie and Ms. Hinkle met with Ms. Bruno to report on their investigation of her claims. Def.'s 56(a)(1) Stmt. ¶ 22; Pl.'s 56(a)(2) Stmt. ¶ 22. They told Ms. Bruno that they looked throughout Sonalysts for another position for her, but there were no available positions outside the Media Center for which she was qualified. Def.'s 56(a)(1) Stmt. ¶ 23; Pl.'s 56(a)(2) Stmt. ¶ 23. They also told Ms. Bruno that given Mr. Casey's harassment of her, they could not in good conscience allow her to continue working on the Mohegan Sun account and risk the possibility that he would harass her again. Def.'s 56(a)(1) Stmt. ¶ 24; Pl.'s 56(a)(2) Stmt. ¶ 24; Bruno Dep. at 203-04, Ex. A [doc. #51]. Sonalysts proposed that Ms. Bruno begin working on other accounts in the Media Center, at the same pay, benefits, title and responsibilities as she had before. Def.'s 56(a)(1) Stmt. ¶ 25; Pl.'s 56(a)(2) Stmt. ¶ 25.

Ms. Bruno agreed to get back to Sonalysts with her decision on its offer within the following week; in the interim she remained on leave. Not having heard from Ms. Bruno by August 2, Ms. Mackie and Mr. Toriello left her a message on her home answering machine inquiring whether she had made a decision. Def.'s 56(a)(1) Stmt. ¶¶ 26-27; Pl.'s 56(a)(2) Stmt. ¶¶ 26-27. In response, Ms. Bruno's attorney, Susan Phillips, wrote a letter to Ms. Mackie stating that she had been retained by Ms. Bruno in connection with a Title VII retaliation claim. *See* Letter of 8/7/00, Ex. 13 [doc. #47]; Def.'s 56(a)(1) Stmt. ¶ 29; Pl.'s 56(a)(2) Stmt. ¶ 29.

In the weeks following Ms. Phillips' letter, and specifically on August 31, Sonalysts' attorney, Alice DeTora, spoke with Ms. Phillips on a number of occasions to discuss Ms. Bruno's claim. The precise content of these conversations is disputed. Def.'s 56(a)(1) Stmt. ¶ 30; Pl.'s 56(a)(2) Stmt. ¶ 30. According to Mr. Toriello, in late August, Ms. DeTora told him that based upon her conversations with Ms. Phillips, Ms. Bruno did not intend to return to work at Sonalysts. *Id*. On September 1, Mr. Toriello sent Ms. Bruno a letter terminating her employment based upon her resignation. *See* Letter of 9/1/00, Ex. 14 [doc. #47]; Def.'s 56(a)(1) Stmt. ¶ 31. Ms. Phillips responded to Mr. Toriello's letter to Ms. Bruno by writing to Ms. DeTora and stating that Ms. Bruno did not intend to resign from Sonalysts. *See* Letter of 9/8/00, Ex. 3 [doc. #72]. This lawsuit followed.

II.

Ms. Bruno claims that Sonalysts retaliated against her in violation of Title VII and the CFEPA for complaining of sexual harassment by Mr. Casey, a Mohegan Sun employee, and for requesting leave under the FMLA. Sonalysts moves for summary judgment on both of Ms. Bruno's claims.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen,* 477 U.S. at 249-50.

In order to survive summary judgment on her Title VII and CFEPA claim, Ms. Bruno must make out a *prima facie* case of retaliation by showing: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Feingold v. New York* 366 F.3d 138, 156 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995)). Retaliation claims are analyzed in the same manner under the CFEPA.

*See Brittell v. Dep't of Correction,* 247 Conn.148, 163-64 (1998) (state anti-discrimination statute is coextensive with the federal statute). Analogously, to survive summary judgement on her FMLA retaliation claim, Ms. Bruno must show: "1) [she] exercised rights protected under the FMLA; 2) [she] was qualified for [her] position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Protenza v. New York*, 365 F.3d 165, 168 (2d Cir. 2004).

The *McDonnell Douglas* burden shifting analysis applies to claims of retaliation under both the FMLA and Title VII. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (applying *McDonnell Douglas* to Title VII retaliation claims); *Protenza* 365 F.3d at 168 (applying *McDonnell Douglas* FMLA retaliation claims). Therefore, under either Title VII or the FMLA, once Ms. Bruno has made her *prima facie* case, the burden shifts to Sonalysts to provide a legitimate non-discriminatory reason for its action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Sonalysts provides such a reason, the burden again shifts to Ms. Bruno to provide evidence from which a jury could conclude that Sonalysts' articulated reasons for its actions are false and that the real reason for its actions was retaliation as alleged. *Id.* at 803.

### III.

#### A.    Title VII and CFEPA.

The Court concludes that Sonalysts is entitled to summary judgment on Ms. Bruno's retaliation claims under Title VII and CFEPA. In those claims, Ms. Bruno asserts that Sonalysts retaliated against her by: (1) deciding not to replace her assistant Mr. Wrann; (2) transferring her off of the Mohegan Sun account and to smaller "underperforming accounts"; and (3) terminating her employment. *See* Pl. Opp. [doc. #51] at 16, 22, 28. However, Sonalysts' failure to replace

Mr. Wrann and Ms. Bruno's transfer off the Mohegan Sun account do not rise to the level of adverse employment actions, and even if they did, Ms. Bruno has failed to rebut Sonalysts' legitimate business reasons for its actions. Only the third action, termination, rises to the level of an adverse employment action. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (describing the adverse employment standard). Yet, Ms. Bruno's termination claim also fails as a matter of law because her own testimony establishes that there is no causal connection between her protected complaint about Mr. Casey and her termination.

Turning first to Ms. Bruno's allegation that Sonalysts retaliated against her by deciding not to replace her assistant Mr. Wrann, the Court seriously doubts whether that decision in this case rises to the level of an adverse employment action. *See LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 693-94 (8th Cir. 2001) (denial of an assistant did not rise to the level of an adverse employment action under Title VII). Even if it did, Sonalysts has offered a legitimate non-discriminatory reason for their action. Messrs. Visiglio, Guardino, and Toriello all testified that the decision not to replace Mr. Wrann was made due to financial constraints. *See* Guardino Dep. at 48-49, Ex. 3 [doc. #47]; Visiglio Dep. at 113-14, Ex. 2; Toriello Dep. at 46, Ex. 5. Ms. Bruno points to no admissible evidence to rebut their testimony.

Ms. Bruno also claims that Sonalysts' decision to transfer her off of the Mohegan Sun account to other less lucrative "non-performing or underperforming" accounts was an adverse employment action because it damaged her future prospects for raises and promotions. *See* Pl. Opp. at 17. Transfers that do not result in a demotion through loss of pay, rank, title, or significant job responsibilities, do not ordinarily constitute adverse employment actions. *See Galabya*, 202 F.3d at 641 ("[A] transfer is an adverse employment action if it results in a change

in responsibilities so significant as to constitute a setback to the plaintiff's career.") (collecting cases); see also *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion."). However, "an involuntary transfer may constitute an adverse employment action if the plaintiff show[s] that the transfer created a materially significant disadvantage with respect to the terms of her employment." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004) (internal quotation omitted).

  Here, it is undisputed that Ms. Bruno would have retained her salary, rank and title if she had accepted Sonalysts' suggested reassignment. *See* Def.' 56(a)(1) ¶ 25; Pl.'s 56(a)(1) ¶ 25. Furthermore, as Ms. Bruno's attorney conceded at oral argument, there is no evidence in the record, beyond Ms. Bruno's conclusory speculation, that Sonalysts' proposed reassignment would have jeopardized Ms. Bruno's future prospects for raises or promotions. *See* Tr. at 11-13 [doc. #61]. Indeed, Mr. Toriello testified, without contradiction, that he saw the opportunity to build new accounts as a valuable one because the company was worried about its over-reliance on Mohegan Sun. *See* Toriello Dep. at 65, Ex. 5 [doc. #47]. Ms. Bruno has offered no evidence to rebut Defendant's testimony. Employers need a certain amount of flexibility to organize their companies efficiently, and courts should hesitate before second-guessing their day-to-day personnel decisions. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions."). Accordingly, the Court concludes that the proposed reassignment of Ms. Bruno from the Mohegan Sun account was not

an adverse employment action.

Even if the proposed reassignment did constitute an adverse employment action, Sonalysts clearly had a legitimate business reason for taking the steps that they did – namely protecting Ms. Bruno from further harassment by David Casey. Despite Ms. Bruno's representation that she was not worried about continuing to work with Mr. Casey, see Bruno Dep. at 203, Ex. 1 [doc. #47], Sonalysts had a legal responsibility to ensure that Mr. Casey's harassment did not continue. *See, e.g.*, *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). In many ways, this is not a typical retaliation case. Unlike some employees who complain of sexual harassment, Ms. Bruno was not told to keep her mouth shut for fear of embarrassing a major client; nor was she forced to continue working with a harasser. To the contrary, after receiving Ms. Bruno's initial complaint against Mr. Casey, Sonalysts went directly to their largest client and reported the inappropriate conduct. The client, Mohegan Sun, agreed that Mr. Casey's conduct was unacceptable and pledged to remove him if Ms. Bruno would only submit a formal complaint for their files. Ms. Bruno chose not to do so. Unable to remove Mr. Casey, who did not work for Sonalysts because of Ms. Bruno's refusal to lodge a formal complaint with Mohegan Sun, Mr. Casey's employer, Sonalysts exercised the only other option it had – reassigning Ms. Bruno within Sonalysts. On the basis of record presented, no reasonable jury could conclude that Sonalysts' articulated reasons for its action was false and that real reason was retaliation for engaging in protected activity.

Finally, with respect to Ms. Bruno's termination, while that certainly would constitute an adverse employment action, Ms. Bruno cannot establish that her termination was causally related to protected activity. At oral argument, Ms. Bruno's counsel argued that Sonalysts punished Ms.

Bruno for complaining about Mr. Casey and then failing to "put[] her money where her mouth is" by reducing her complaint to writing. Tr. at 55 [doc. #61]. If Sonalysts had fired her for complaining about sexual harassment by Mr. Casey, that would surely satisfy Ms. Bruno's burden.

However, her counsel's assertion is not supported by the record and by her own client's testimony. Ms. Bruno testified at her deposition that Sonalysts did not punish her because she complained about Mr. Casey's sexual harassment. Instead, Ms. Bruno testified that Sonalysts punished her because Mohegan Sun viewed her complaint against Mr. Casey as a way to fire him, and Mohegan Sun supposedly became upset when she did not want to file a formal complaint. As Ms. Bruno articulated her theory, Sonalysts took the actions that it did because "[she] did not back Mitchell [Etess] up in getting rid of David [Casey] and [ ] the only way they were going to get rid of [Ms. Bruno] was to finally make [her] unhappy and miserable and demote [her]." *See* Bruno Dep. at 173-75, Ex. 1 [doc. #47]. Ms. Bruno repeated these allegations in a letter that she sent to Andrew Toriello: "I believe that my unwillingness to be used in a scheme to fire David Casey . . . has prompted the negative treatment I am receiving." Letter of 7/13/00, Ex. 6 [doc. #47]. Far from being punished for engaging in a protected activity, if what Ms. Bruno says is true, Sonalysts retaliated against her because she refused to help fire an employee of a major client. That allegation, even if true, is not actionable under Title VII. Therefore, the Court finds based upon Ms. Bruno's own testimony that no reasonable juror could conclude that Ms. Bruno was terminated for engaging in protected activity.[2]

---

[2] Even if the Court were to accept Ms. Bruno's attorney's theory that Sonalysts fired Ms. Bruno for making the original complaint against Mr. Casey, and then refusing to go all the way with it, on the undisputed facts a reasonable jury still could not find that Ms. Bruno established

B.  FMLA Claim

Ms. Bruno also claims that Sonalysts retaliated against her for seeking FMLA leave. At oral argument, Ms. Bruno limited her FMLA claim to a retaliation claim only. That is, Ms. Bruno makes no substantive claim under the FMLA; she alleges only that she was retaliated against because she inquired about taking FMLA leave and about acquiring leave forms. *See* Tr. at 4-5 [doc. #61]; *see also* Pl.'s Mot. for Permission to File Am. Compl. [doc. #33] at 1 (clarifying that Ms. Bruno makes no substantive FMLA claim because she prefers not to disclose information that would establish whether or not she actually suffered from a serious medical condition). The parties do not dispute that Ms. Bruno availed herself of protected rights under the FMLA when she requested FMLA leave. There is also no dispute that Ms. Bruno was qualified for her position at Sonalysts. Therefore, the only issue before the Court with respect to Ms. Bruno's FMLA claim, is whether Sonalysts took an adverse employment action against her that was causally related to her FMLA request.

Ms. Bruno alleges that Sonalysts took the following adverse actions against her on account of her FMLA claim: (1) transferring her off of the Mohegan Sun account and to smaller

---

the causation element of her retaliation claim. Ms. Bruno's counsel theorizes that Mohegan Sun was unhappy about her initial complaint regarding Mr. Casey and so it put pressure on Sonalysts to punish Ms. Bruno for refusing to pursue the complaint. Yet, the only evidence in the record that could possibly show that Mohegan Sun pressured Sonalysts is the fact that Mr. Etess and Mr. Guardino rode in the same car on July 7, 2000, the same day that Ms. Bruno received a negative performance review from her supervisor Mr. Visiglio and learned from him that her assistant, Mr. Wrann, would not be replaced. But Mr. Guardino unequivocally testified that he and Mr. Etess did not even discuss Ms. Bruno during the car ride, see Guardino Dep. at 52, Ex. B [doc. #51], and Ms. Bruno has not submitted any evidence to the contrary. Thus, a jury would have no basis other than rank speculation to accept the claims of Ms. Bruno's counsel. *See Bonton v. City of New York*, No. 03CV2833, 2004 WL 2453603 at *2 (S.D.N.Y. Nov. 3, 2004) (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999)) (speculation by the jury is impermissible).

"underperforming accounts"; and (2) terminating her employment. *See* Pl.'s Opp. [doc. #51] at 16, 22, 28. The Court concluded in the previous section that Ms. Bruno's reassignment did not constitute an adverse employment action and that in any event, Sonalysts had an unrebutted and legitimate business reason for its actions. Therefore, the transfer off of the Mohegan Sun account cannot support Ms. Bruno's FMLA retaliation claim.

That leaves Ms. Bruno's allegation that Sonalysts terminated her in retaliation for asking about FMLA leave and requesting the appropriate leave forms. Ms. Bruno's termination on September 1, 2000, occurred about a month and a half after she first expressed a desire to take FMLA leave and inquired about obtaining leave forms and while she was out on claimed FMLA leave. Therefore, Ms. Bruno has established the *prima facie* causal connection based on temporal proximity. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (causal connection established when termination occurred less than two months after complaint to management). The parties' real dispute centers on the question of whether Sonalysts had a legitimate non-discriminatory business reason for terminating Ms. Bruno when it did.

Sonalysts argues that Ms. Bruno's lawyer, Ms. Phillips, told Sonalysts' lawyer, Ms. DeTora, that Ms. Bruno did not desire to return to work. Thus, Mr. Toriello asserts that he understood Ms. Bruno to have resigned, and as a result, Sonalysts argues that Mr. Toriello had a legitimate business reason for sending Ms. Bruno a termination letter on September 1, 2000. *See* Ex. A [doc. #62]. In support of this argument, Sonalysts offers Mr. Toriello's letter and testimony by Ms. DeTora and Mr. Toriello indicating that Ms. DeTora understood Ms. Phillips to have told her that Ms. Bruno did not intend to return and that Ms. DeTora relayed this to Mr. Toriello. *See* DeTora Dep. at 1, Ex. C [doc. #75]; Toriello Dep. at 74, Ex. F; Letter of 9/1/00,

Ex. O.

Ms. Bruno denies that her attorney communicated any desire on her part to resign. She also objects to Sonalysts' offer of evidence regarding Ms. Bruno's alleged resignation, on the grounds that the conversations between Ms. Phillips and Ms. DeTora occurred during the course of settlement negotiations and are therefore inadmissible under Rule 408 of the *Federal Rules of Evidence*. Sonalysts counters that it offers Mr. Toriello and Ms. DeTora's testimony only as evidence of Mr. Toriello's state of mind when he wrote to Ms. Bruno, and thus the statements fall within the exception to Rule 408 for evidence offered for "another purpose" and not "to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408.

Having considered the matter at considerable length,[3] the Court now concludes that regardless how it rules on the admissibility of the evidence Sonalysts seeks to offer, the Court cannot say that Sonalysts is entitled to summary judgment as a matter of law on the FMLA retaliation claim because there are issues of material fact regarding the circumstances of Ms. Bruno's departure from Sonalysts. Without the evidence of what Ms. Phillips supposedly said to Ms. DeTora about Ms. Bruno's intentions to resign, Mr. Toriello has no justification for his letter. Even with the evidence of Ms. Phillips' conversations with Ms. DeTora regarding Ms. Bruno's

---

[3] In addition to hearing oral argument by the parties in open court on November 21, 2003 [doc. #59], the Court reviewed two rounds of supplemental briefs from the parties [doc. ## 63-66]. Nevertheless, the Court concluded that it could not decide whether the evidence of Ms. Bruno's alleged resignation was admissible without hearing from Ms. Phillips and Ms. DeTora precisely what they discussed. Since Ms. Phillips was now required to serve as a witness, the Court allowed Ms. Bruno time to obtain new counsel. In the interim, the Court denied Sonalysts' Motion for Summary Judgment [doc. #44] without prejudice to renewal after Ms. Bruno retained new counsel. *See* Ruling and Order of 3/31/04 [doc. #66]. Subsequently, the parties deposed Ms. DeTora and Ms. Phillips and submitted a final round of briefs on the admissibility of Ms. Bruno's alleged resignation [doc. ## 72, 75].

alleged resignation, the jury would be entitled to disbelieve Mr. Toriello's and Ms. DeTora's version of the facts and believe Ms. Phillips' assertion that she did not communicate Ms. Bruno's resignation to Ms. DeTora. Indeed, that is precisely what Ms. Phillips said in her letter dated September 8, 2000. *See* Letter of 9/8/00, Ex. 3 [doc. #72]. Accordingly, the Court concludes that disputes over material issues of fact regarding Plaintiff's FMLA retaliation claim preclude the entry of summary judgment for Defendant on that claim.

     Though not essential for the Court's ruling on summary judgment, a ruling on the Rule 408 issue is necessary before trial, and since it has now been fully briefed by the parties, the Court will, in the interest of justice and judicial economy, address the admissibility of the evidence regarding Ms. Bruno's resignation. The Court notes that Defendant has expressly indicated that it does "not seek[ ] to introduce evidence of the actual conversation between [Ms.] DeTora and [Ms.] Phillips," but only evidence regarding Mr. Toriello's belief that Ms. Bruno resigned. *See* Def.'s Supp. Mem. [doc. #63] at 2. In order to understand this issue, a thorough review of the record will be helpful.

     The record shows that Ms. Phillips and Ms. DeTora had a number of discussions in late August regarding "the possible resolution of [Ms.] Bruno's issues with her employer." DeTora Dep. at 7, Ex. 2 [doc. #72]; Phillips Dep. at 9-10, Ex. 1. The parties agree that on August 31, Ms. DeTora extended a settlement offer of "three-month[s] . . . of severance or return to work." DeTora Dep. at 25; Phillips Dep. at 25-26. Ms. DeTora claims that during their August 31 conversation, Ms. Phillips rejected that offer on behalf of Ms. Bruno and that Ms. DeTora considered this "outright rejection" to be the end to their settlement discussions. *See* DeTora Dep. at 25. Ms. Phillips denies that she rejected the offer because "[b]ecause [she] would not

-15-

have had the authority to respond the that settlement proposal on behalf of [Ms. Bruno]." Phillips Dep. at 26.  After speaking with Ms. Phillips on Aug 31, Ms. DeTora told Mr. Toriello, "[Ms. Bruno] rejected the three months settlement offer and **that she has** no interest in returning to work." DeTora Dep. at 1, Ex. C [doc. #75]; Toriello Dep. at 74, Ex. F.  The next day, Mr. Toriello sent Ms. Bruno a letter stating: "We understand that in a discussion our attorney, Alice DeTora, had with your attorney, Sue Phillips, on Thursday August 31, 2000, your attorney represented that you had no in interest in returning to your position at Sonalysts.  Therefore we will consider your employment to have been terminated effective as of August 31, 2004."  Letter of 9/1/00, Ex. 14 [doc. #47].

Ms. DeTora and Ms. Phillips spoke again on September 5.  Ms. DeTora claims that this phone call did not change her view that Ms. Bruno had "outright reject[ed]" Sonalysts offer and she viewed any settlement negotiations to have concluded as of August 31.  DeTora Dep. at 25.  Ms. Phillips is of the view that settlement negotiations were still in progress after August 31 and she indicated this in a letter to Ms. DeTora on September 8.  "The wording of Mr. Toriello's letter suggests that Sonalyst[s] views Ms. Bruno as having resigned from her position effective August 31, 2000 . . . This is by no means true, as evinced by my follow up call to you on September 5, 2000."  Letter of 9/8/00, Ex. 3 [doc. #72].

Based on these facts, the Court is not convinced that the evidence of Ms. Bruno's resignation falls squarely within Rule 408.  Clearly Ms. Phillips' alleged statement to Ms. DeTora informing her that Ms. Bruno did not intend to come back to work, Ms. DeTora's statement to Mr. Toriello relating this information to him, and Mr. Toriello's explanation of his reason for terminating Ms. Bruno, are not "[e]vidence of (1) furnishing or offering or promising

to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim." Fed. R. Evid. 408. To the extent that Rule 408 applies in this case at all, therefore, Ms. Bruno must rely on the second sentence of the rule, which more generally precludes "evidence of conduct and statements made in compromise negotiations." *Id*. The applicability of this portion of the rule is less than certain given that there is a dispute over whether settlement negotiations were still in progress when the statements in question were made.

In any event, although it is a close question, the Court ultimately concludes that this evidence of Ms. Bruno's resignation falls within the exception to Rule 408 for evidence offered for "another purpose" and is therefore admissible only to show Mr. Toriello's state of mind. Fed. R. Evid. 408. In reaching this conclusion, the Court has carefully considered the competing policy considerations on each side of the issue, "weigh[ing] the need for such evidence against the potentiality of discouraging future settlement negotiations." Jack B. Weinstein and Margaret A. Berger, 2 *Weinstein's Federal Evidence* § 408.08[1] (2004) (further noting that "the trial judge . . . has broad discretion as to whether to admit evidence of settlement negotiations offered for another purpose."). *See also Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (same).

On the facts of this case, the need for the disputed evidence is strong because excluding all reference to the settlement discussions would strip Sonalysts of any ability to offer a legitimate non-retaliatory reason for terminating Ms. Bruno's employment. Courts routinely admit evidence for "another purpose" where exclusion of the evidence would substantially impair the plaintiff's ability to make a claim for a wrong that was committed in the course of settlement

discussions. *See, e.g.*, *Uforma v. Shelby Business Forms*, 111 F.3d 1284, 1293-94 (6th Cir. 1997) ("Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations."). The Court sees no reason to deny defendants the same protection when they seek to rebut allegations of wrongful conduct. *See Cochenour v. Cameron Savings & Loan, F.A.*, 160 F.3d 1187, 1190 (8th Cir. 1998) (letter sent in the course of settlement discussions in which plaintiff expressed her intention to retire admissible to rebut plaintiff's allegation that employer forced her to retire early); *Thomas v. Resort Health Related Facility*, 539 F. Supp. 630, 638 (E.D.N.Y. 1982) (employer's offer to reinstate plaintiff admissible to show that subsequent lost wages were not due to discrimination). Indeed, it would be a strange world in which an employer could not act on an employee's unequivocal resignation during the course of settlement talks for fear of a lawsuit based on wrongful termination.

On the other hand, wholesale admission of the evidence related to settlement conversations between Ms. Phillips and Ms. DeTora would undermine the "public policy favoring the compromise and settlement of disputes" that underlies Rule 408. *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 828 (2d Cir. 1992) (quoting Fed. R. Evid. 408 advisory committee's note). Parties will be less likely to openly engage in settlement talks when faced with the risk that these statements could later be used against them at trial. The Court is particularly troubled by the fact that admitting this evidence carries with it the "undesirable result" that attorneys, like Ms. Phillips, are "forced to testify as to the nature of the discussions and thus [are] disqualified as trial counsel." *Pierce*, 955 F.2d at 828.

Nevertheless, in this case, the Court's concerns are somewhat mitigated for three reasons.

First, it is not clear that the statements Sonalysts seeks to introduce were even made in the context of settlement discussions, as Ms. DeTora has testified that she viewed discussions to be over when Ms. Phillips allegedly rejected her offer.  And second, even if the statements were made in what one or more of the participants believed were the context of settlement discussions, revealing the statements does not undermine the claim that was being discussed at the time.  At the time that settlement discussions took place, Ms. DeTora and Ms. Phillips were discussing Ms. Bruno's claim for retaliation based only on the events that had happened up until that point in time – they could not have been settling Ms. Bruno's termination-based claim (the only claim remaining in this case) because Ms. Bruno had not been terminated at the time of their discussions.  Finally, the Court notes that Ms. Bruno has already obtained new counsel.  As undesirable as that result is, Ms. Bruno will not be further prejudiced in this respect by the Court's decision to admit the evidence.

For these reasons, the Court finds that the competing interests weigh more heavily in favor of admitting the evidence of Ms. Bruno's alleged resignation for the limited purpose requested.  The Court will minimize any possible prejudice to Ms. Bruno by instructing the jury that it may consider Ms. Bruno's alleged resignation only with respect to Mr. Toriello's state of mind and not as evidence of the strength or weakness of Ms. Bruno's claim.[4]  The Court emphasizes that Sonalysts has indicated that it does "not seek[ ] to introduce evidence of the actual conversation between [Ms.] DeTora and [Ms.] Phillips," but only evidence regarding Mr. Toriello's belief that Ms. Bruno resigned.  *See* Def.'s Supp. Mem. [doc. #63] at 2.  Thus, the

---

[4] To that end, the Court will entertain suggestions from either party for cautionary instructions to be given to the jury.

Court will admit evidence of the actual conversation between Ms. DeTora and Ms. Phillips only to the extent that Ms. Bruno wishes to do so to rebut Mr. Toriello's explanation of his actions.

IV.

For the aforementioned reasons, the Court GRANTS Defendant's Renewed Motion for Summary Judgment [**doc. #68**] with respect to Ms. Bruno's claim for retaliation under Title VII and CFEPA, and DENIES the motion with respect to her FMLA retaliation claim.

IT IS SO ORDERED.

/s/      Mark R. Kravitz      
United States District Court

Dated at New Haven on November 23, 2004.